# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 10-61348-CIV-ROSENBAUM
## (Consent Case)

ANDREW A. OSTROW,

      Plaintiff,

vs.

GLOBECAST AMERICA INCORPORATED,
a Delaware corporation,

      Defendant.

_____/

## ORDER

      This matter comes before the Court upon Defendant GlobeCast America, Inc.'s Motion for

Summary Judgment ("Motion for Summary Judgment") [D.E. 15].   The Court has carefully

considered the Motion, all filings in support thereof and in opposition thereto, and the record in this

case and is otherwise duly advised in the premises.   After this full review, the Court grants in part

and denies in part Defendant's Motion for the reasons set forth below.

## *I.  BACKGROUND*

      Plaintiff Andrew Ostrow ("Plaintiff" or "Ostrow") filed his complaint against his former

employer, Defendant GlobeCast America, Inc. ("Defendant" or "GlobeCast"[1]), in the Circuit Court

of the Seventeenth Judicial Circuit, in and for Broward County, Florida.  *See* D.E. 1-1.  The

Complaint sets forth a claim for age discrimination under the Age Discrimination in Employment

Act, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count I), and a claim for breach of contract (Count II).

---

[1]The Court points out that "GlobeCast" in this Order refers only to GlobeCast America,
Inc., not to any of the other GlobeCast companies around the world.

More specifically, GlobeCast declined to renew Ostrow's employment contract at the expiration of its term.  At the time, Ostrow, who had served as GlobeCast's Vice President, Business and Legal Affairs, and General Counsel, was sixty years old.  GlobeCast denies that it discriminated against Ostrow and asserts that it had legitimate, non-discriminatory reasons for its actions.

With respect to the claim for breach of contract, Ostrow alleges that GlobeCast failed to comply with obligations under Ostrow's employment contract to make bonus and severance payments to Ostrow.  For its part, GlobeCast disputes that it was required to make any such payments.

The parties consented to magistrate judge jurisdiction.  As a result, on August 23, 2011, this case was transferred to me for all further proceedings.

## II.  MATERIAL FACTS[2]

### A.     Defendant GlobeCast

Defendant GlobeCast, which operates in the telecommunications industry, D.E. 17-1 at ¶ 5, is a wholly-owned subsidiary of GlobeCast Holding.  D.E. 18-1 at 21:23 - 22:1;[3] D.E. 23-5 at 18:8 - :12.  GlobeCast Holding, in turn, is owned by France Telecom.  *Id.* at 18:13 - :14.  GlobeCast has a number of affiliate companies around the world.  *See* D.E. 18-1 at 20:13 - :25; *id.* at 26:11 - :19.

---

[2]The Court has set forth the material facts based upon its review and consideration of Defendant's Statement of Undisputed Facts [D.E. 16], Plaintiff's Response in Opposition to Defendant's Statement of Material Facts [D.E. 25], and affidavits and deposition transcripts of the various witnesses in this case, including any attached exhibits.  The Court further notes that pursuant to Local Rule 7.5.D, all material facts set forth in Defendant's statement and supported by evidence of record are deemed admitted unless controverted by Plaintiff's statement.

[3]D.E. 18-1 is the mini-transcript of Ostrow's deposition.  References to page numbers correspond to the deposition page number, not the CM/ECF page number imprinted at the top of each page of the mini-transcript.  Numbers appearing before the colon represent page numbers, while numbers set forth after the colon refer to line numbers.

2

At various times relevant to this case, GlobeCast America has maintained offices in Medley, Florida; Sunrise, Florida; New York, New York; Washington, DC; and California. *See* D.E. 18-1 at 29:3 - 31:9.

**B.    Plaintiff Ostrow**

Plaintiff Ostrow was born in 1949. D.E. 18-1 at 7:24 - :25. After graduating from the University of Pennsylvania with a degree in economics and completing a roughly four-year stint in the United States Navy, Ostrow attended law school at the University of Miami. *Id.* at 8:1 - :16. Upon graduation from the University of Miami School of Law, Ostrow clerked for the Honorable James C. Paine on the United States District Court for the Southern District of Florida. *Id.* at 8:17 - :24. Following his clerkship, Ostrow practiced civil litigation at private law firms and subsequently engaged in civil litigation as a solo practitioner. *Id.* at 8:25 - 11:2. As a solo practitioner, Ostrow also handled a "smattering of transactional work." *Id.* at 11:6 - :18.

**C.    Ostrow's Offer of Employment with GlobeCast**

During the course of his solo practice, Ostrow worked as outside counsel for about two to three years on matters for GlobeCast. *Id.* at 15:11 - :16. In approximately April 2003, David Sprechman ("Sprechman"), who was then serving as the chief executive officer ("CEO") of GlobeCast, offered Ostrow a position with GlobeCast as GlobeCast's general counsel. *Id.* at 13:20 - 15:10.

After speaking further with Sprechman — and only Sprechman — Ostrow accepted the job on an at-will employment basis. *Id.* at 17:1 - :13; 85:1-:8. He was 54 years old. *See* D.E. 1-1 at ¶ 7. At that time, GlobeCast was headquartered in Medley, Florida, and the position Ostrow accepted was likewise located there. D.E. 18-1 at 17:14 - :18. In order to be closer to work, Ostrow moved from West Palm Beach to Miami Beach after deciding to join GlobeCast. *Id.* at 18:7 - :11.

3

When Ostrow began working at GlobeCast, Brian Sutnick ("Sutnick") held the position of in-house counsel. *Id.* at 16:14 - :17. Sutnick, who remained at GlobeCast until the summer of 2006, was mainly responsible for drafting customer contracts. *Id.* at 16:18 - :22; 38:17 - :25.

As the general counsel for GlobeCast, Ostrow's responsibilities included supervision of Sutnick, contract negotiation and preparation for vendors and customers, civil litigation, legal advice, and risk management. *Id.* at 14:17 - 15:7; 20:8 - :25. Ostrow reported to Sprechman and had a "dotted-line" reporting relationship with Paul Werna, Ostrow's counterpart in Paris, and to Christian Pinon ("Pinon"), the Chairman and CEO of GlobeCast Worldwide throughout Ostrow's employment with GlobeCast. *Id.* at 25:24 - 26:24. When Ostrow began working for GlobeCast, it employed more than 300 people. *Id.* at 22:14 - :18.

**D.    The Employment Contracts**

On or about January 1, 2004, GlobeCast and Ostrow entered into an employment agreement for the period from January 1, 2004, through December 31, 2005, under which Ostrow was to hold the position of Vice President of Business and Legal Affairs and General Counsel. D.E. 18-1 at 86:2 - 87:23. Under this agreement, Ostrow's base salary was $175,000 per year. *Id.* at 88:5 - :9. One section of the agreement provided that Ostrow "shall be entitled to receive a semi-annual bonus of up to $26,250, which is 15 percent of his annual base salary, if [Ostrow] meets certain established objectives set forth at the beginning of each period." *Id.* at 88:10 - :24. The agreement did not include a provision for renewal. *Id.* at 66:12 - :14.

Nevertheless, upon the expiration of the 2004-2005 contract, Ostrow continued as general counsel without a written agreement until approximately April 1, 2006, when the parties entered into a second employment agreement covering the period from April 1, 2006, through December 31, 2007. *Id.* at 92:20 - 93:8; 94:5 - :8. The 2006-2007 agreement again described Ostrow's position

4

as the Vice President, Business & Legal Affairs, and General Counsel and set forth a base salary of

$190,000 per year for Ostrow.  *Id.* at 95:6 - :10.  As the first employment agreement had, the 2006-

2007 agreement also contained a bonus provision similar to that included in the 2004-2005

employment agreement.  *Id.*  95:11 - :18.  Also like the 2004-2005 agreement, the 2006-2007

contract did not contain a renewal provision.  *Id.* at 68:25 - 69:9.  Sprechman was serving as the

CEO of GlobeCast at the time that the parties entered into the 2006-2007 employment agreement.

*Id.* at 94:9 - :15.

      Subsequently, the parties signed a third employment agreement for the period from January

1, 2008, through December 31, 2009.  *See* D.E. 24-5 at 1.  The 2008-2009 agreement provided,

> The Employee's employment by [GlobeCast] under this Agreement
> shall commence on January 1, 2008, and shall terminate on December
> 31, 2009.
>
> Notwithstanding the aforementioned, [GlobeCast] may terminate this
> Agreement at any time in its sole discretion with thirty (30) days
> written notice to Employee.  In the event that [GlobeCast] so elects
> to terminate this Agreement for any reason except for cause (as
> defined herein), [GlobeCast] shall pay Employee the remaining
> balance due under this Agreement, as well as payments due in
> accordance with the involuntary termination provisions stipulated in
> paragraph 8 of this Agreement.

*Id.* at § 2.  In this contract, GlobeCast agreed to compensate Ostrow at the rates of $209,000 for 2008

and $219,000 for 2009.  *Id.* at § 3.A.  Similar to the two prior employment agreements, the 2008-

2009 agreement set forth a bonus provision that stated, in relevant part,

> Employee shall be entitled to receive a semi-annual bonus of up to
> 15% of his/her annual base salary if Employee meets certain
> established objectives set forth at the beginning of each period.  The
> objectives that are established are to be determined by the Company,
> at its sole discretion, and shall be final and binding. . . .

*Id.* at §3.B.  The 2008-2009 agreement also contained another provision relevant to this case —

5

Section 8 — Involuntary Termination:

> In the event of an involuntary termination of the Employee, the
> Company shall pay the Employee (subject to normal withholdings):
> a) the remaining balance due under this Agreement, plus b) a one-
> time payment equivalent to six (6) months['] base salary at his/her
> current rate.  In addition, the Company shall pay the COBRA
> premiums for medical insurance for employee and dependent
> coverage the first three months following termination of employment.
> The provisions of this paragraph shall remain in effect as long as
> Employee's employment with the Company is continuous without a
> break in service and shall survive the termination of this Agreement.
> Payment shall be made no later than thirty (30) calendar days from
> the date of termination.
>
> Involuntary termination is defined as the termination of the Employee
> by the Company without Cause . . . .

*Id.* at § 8.  Mary Frost ("Frost"), who was serving as the CEO of GlobeCast at the time that the

parties entered into the 2008-2009 employment agreement, signed on behalf of GlobeCast.  *See id.*

at 8.  Like the two prior contracts, the 2008-2009 employment agreement contained no provision for

renewal.  *See* D.E. 18-1 at 115:11 - :20.

Although Ostrow served as general counsel to GlobeCast while he was employed there,

Ostrow did not draft the employment agreements into which he entered.  *Id.* at 70:7 - :13.  Rather,

the contracts were preexisting agreements.  *Id.*  Nevertheless, during his employment with

GlobeCast, Ostrow was asked to review the form employment agreement that had been used in his

2004-2005, 2006-2007, and 2008-2009 contracts, as well as with other high-level GlobeCast

employees.  *Id.* at 70:7 - 71:5.  In response to this request, Ostrow made suggestions pertaining to

the issue of the non-compete provision within the employment agreements.  *Id.* at 99:1 - :13.

**E.**     **The Hiring of Carlo Carroccia**

As previously noted, when Ostrow began his employment with GlobeCast, GlobeCast also

employed another lawyer in its legal department: Brian Sutnick.  D.E. 18-1 at 16:14-:22.  Sutnick

remained employed by GlobeCast in its legal department until the summer of 2006.  *Id.*  Upon
Sutnick's departure from GlobeCast, GlobeCast arranged for another attorney, Charlene Wixon
("Wixon"), to work in its legal department.  *Id.* at 41:10 - :15.  Wixon remained in GlobeCast's legal
department from approximately the fall of 2006 to the end of 2008.  *Id.*  At that time, Wixon returned
to GlobeCast France.  *Id.* at 42:7 - :20.  Although Ostrow was Wixon's supervisor during her
employment with GlobeCast, Wixon was located in Washington, DC, and took direction from Frost
as well as Ostrow.  *Id.* at 41:16 - 42:1.  For the most part, Wixon worked on customer contracts.  *Id.*

In about March 2009, Pinon and Elisabeth Mazurie ("Mazurie"), then the general counsel
of GlobeCast Worldwide, considered replacing Ostrow.  D.E. 17-5 at ¶ 9;[4] D.E. 17-3 at ¶ 7.
Although they decided against terminating Ostrow's employment at that time, they decided to hire
a second attorney for GlobeCast at that time.  D.E. 17-5 at ¶ 10; D.E. 17-3 at ¶ 8.

Meanwhile, Carlo Carroccia ("Carroccia"), who was born in 1971, had inquired of a friend

---

[4]Ostrow seeks to strike the declarations of Pinon and Mazurie for alleged failure to
comply with the requirements of 28 U.S.C. § 1746(1).  Section 1746(1) requires that declarations
be in writing subscribed by the declarant "as true under penalty of perjury, and dated in
substantially the following form: (1) If executed without the United States: 'I declare (or certify,
verify, or state) under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.  Executed on (date).'" 28 U.S.C. § 1746(1).  The Mazurie and
Pinon declarations, which both are subscribed following the statements, "I declare under penalty
of perjury that the foregoing is true and correct.  Executed on [date]," do not comply with this
requirement.  While GlobeCast argues that they substantially comply and that that is all that
Section 1746 requires, comparison of Section 1746(1) (execution outside the United States) with
Section 1746(2) (execution inside the United States), reveals that the Pinon and Mazurie
declarations omit the one necessary item for declarations sworn outside the United States that
does not exist for those sworn within the United States: an acknowledgment that the declarant is
subject to the laws of perjury *of the United States*.  Consequently, the Pinon and Mazurie
declarations do not substantially comply with Section 1746(1) and should be stricken.  Because
the declarations contain information that fills in some gaps necessary to understand the sequence
of events in this case, however, in this Background section, the Court relies upon some of the
information in the declarations to put into context other events.  The Court, however, does not
rely upon the declarations to find that summary judgment should be entered against Ostrow.

7

who had recently been hired by GlobeCast whether GlobeCast needed a contracts attorney. D.E. 23-6 at 11:7 - :17; *id.* at 3:10 - :11. Carroccia had previously worked for the law firm of Clark & Washington on bankruptcy matters, *id.* at 7:23 - 8:12; for PanAm Sat Corporation, a satellite company, as in-house counsel, *id.* at 8:14 - :23; for Intelsat as in-house counsel, *id.* at 8:24 - 9:18; for T-Systems North America, a telecommunications company owned by Deutsche Telekom, *id.* at 10:8 - :22; and for IntraLinks, a software service company, *id.* at 10:23 - 11:3.

In response to Carroccia's inquiry with his friend, GlobeCast approached Carroccia in March or April 2009 and scheduled a meeting. *Id.* at 11:7 - :17; 12:3 - :17. A meeting between Carrroccia and Pinon, Mary Salih, Anne Philippe (then the chief financial officer of GlobeCast and head of GlobeCast's human resources department, D.E. 17-4 at ¶ 4), and Lisa Coelho (then GlobeCast's Vice President of World TV, D.E. 23-4 at 6:3 - :8) occurred in New York. D.E. 23-6 at 12:18 - :23. Ostrow was not present for this meeting, and the GlobeCast representatives who were there did not mention to him or the possibility that a legal department position with GlobeCast might involve reporting to or working with another attorney. *Id.* at 14:5 - :9; 15:14 - :16.

Following this meeting, Carroccia received a telephone call from Cathleen Togut ("Togut"), who was the vice president of human resources at GlobeCast. *Id.* at 16:10 - :19. She requested references and later advised Carroccia that Mazurie wished to meet with him. *Id.* at 16:10 - 17:13. Togut had been told by others at GlobeCast that GlobeCast would be hiring another attorney, and she was asked to coordinate the interviewing and hiring process, to keep the process confidential, and not to share the process with Ostrow. D.E. 23-1 at ¶ 10.

At the beginning of May 2009, Carroccia traveled to France to meet with Mazurie. D.E. 23-6 at 17:14 - :23. During this meeting, David Justin, who was soon to take the position as CEO of GlobeCast, joined in for about fifteen to twenty minutes. *Id.* at 19:1 - :16. Carroccia learned at this

meeting that GlobeCast had another attorney based in South Florida, but if Carroccia were hired, Carroccia would be based in New York, supporting the sales team.  *Id.* at 20:3 - :13.

After the meeting, Carroccia received a letter from GlobeCast offering him employment at will for an annual salary of $155,000.  *Id.* at 21:5 - :19.  The letter further stated that if Carroccia's performance met expectations, a possibility of promotion to general counsel existed.  *Id.* at 23:21 - 24:6.

Carroccia accepted the offer and, on June 8, 2009, came onboard with GlobeCast as assistant general counsel.  *Id.* at 22:4 - :17; 24:10 - :11.  He had his first contact with Ostrow after beginning the job.  *Id.* at 24:18 - :24.  Ostrow believed Carroccia to be qualified for Carroccia's position as Ostrow understood it — that was, to provide legal assistance to GlobeCast's sales department in New York.  D.E. 18-1 at 61:24 - 62:9.

## F.    The Events Preceding the Non-Renewal of Ostrow's Contract

GlobeCast had lost money every year from 2006 through beyond the non-renewal of Ostrow's contract at the end of 2009 and continued to operate thanks only to the financial support of its shareholder.  D.E. 17-2 at ¶ 17.  The company had undergone repeated restructuring over the years, resulting in a decrease in employees from more than 300 to approximately 150 and, in 2005, GlobeCast had moved its headquarters from Florida to New York in an effort to further consolidate its workforce.  D.E. 18-1 at 22:14 - :23; 29:3 - 31:9.  In 2008, GlobeCast's net income was negative by more than $15 million.  D.E. 17-2 at ¶ 17.

Following the end of Mary Frost's tenure as GlobeCast's CEO on August 20, 2008, Christian Pinon assumed the role on an interim basis until June 1, 2009.  D.E. 23-2 at ¶ 2; D.E. 17-5 at ¶ 5. At that time, David Justin ("Justin") became the CEO of GlobeCast.  D.E. 17-2 at ¶ 6; D.E. 23-5 at 19:10 - :14.  One of his duties included attempting to improve GlobeCast's financial performance.

D.E. 17-2 at ¶ 18.

When Justin took over as CEO, Pinon advised Justin that Pinon did not feel that Ostrow had been performing up to company expectations and that Pinon had not intended to enter into another employment agreement with Ostrow once the term of Ostrow's 2008-2009 employment agreement expired on December 31, 2009.  D.E. 17-2 at ¶ 9.  Justin, nevertheless, decided to evaluate Ostrow's performance over the remaining months of Ostrow's contract before deciding whether to offer Ostrow a new agreement.  *Id.*

On June 16, 2009, Justin held a meeting with GlobeCast's legal department during which he discussed, among other issues, his expectations for GlobeCast's legal department's performance during the next several months.  *Id.* at ¶10; *see also* D.E. 17-2 at Exhibit A.  According to an e-mail from Justin to the participants of the meeting after the meeting, Ostrow and Carroccia were "to check [ASAP] if [the] current "Europe generated" template for content rights acquisition need[ed] modification to fit requirements that may be specific to the US," and, if so, they were to "modify [it] by [the] end of June . . . [while] keeping a maximum of consistency between the two documents." D.E. 17-2 at Exhibit A.  Among other tasks, Carroccia was "to deal with the new contracts (with spill-over to Charlene [Wixon] if necessary, and after routing through [Ostrow]."  *Id.*  In addition, based on Ostrow's description of pending litigation at the time, Justin's e-mail described the status as including "16.5 cases open."  *Id.*  The e-mail continued, "Easy" cases should be closed in 6 to 9 months[;] cases with counterclaims could take up to 2 years. [Ostrow] to continue handling these cases with the objective of finishing a maximum of them by year's end."  *Id.*  Most of the cases pending at that time were collection cases, cases where customers previously obtained by GlobeCast's sales department failed to pay GlobeCast what GlobeCast believed it was owed.  D.E. 23-5 at 40:3 - :11; D.E. 23-5 at 76:10 - :14.  When GlobeCast initiated each of these cases, the CEO

at that time authorized the litigation.  D.E. 23-5 at 82:15 - :20; D.E. 18-1 at 35:23 - 36:20.

The e-mail further reported that Ostrow was "to take the lead on the renegotiation of the HBO lease contract (scope, duration, price)[,] [with the objective being] to have this signed before [the] end [of] 2009, so that long term business can be brought to Sunrise . . . ."  D.E. 17-2 at Exhibit A, p. 2.  This provision referred to a lease between HBO and GlobeCast.  *Id.*  Finally, the e-mail stated with regard to vendor contracts, "We will see as they come who takes care of them."  *Id.*  Although the e-mail did not specifically mention any other tasks designated for Ostrow, Justin also advised Ostrow that he was responsible for finalizing the agreement between GlobeCast and Orange Business Services to do business in Latin America.  D.E. 17-2 at ¶ 10; D.E. 17-1 at ¶ 14.

With regard to the tasks Justin set forth at the June 16, 2009, meeting, the template for content rights acquisition was not completed until November 2009.  D.E. 17-2 at ¶ 12.  Ostrow found "numerous issues with the document proposed by the Paris-based GlobeCast France attorneys" and tried to resolve them without success.  D.E. 24-1 at ¶ 16.  Nevertheless, Ostrow continued to work on the completion of specific program distribution agreements (content rights) with a number of programmers, including Antenna, SIC, Phoenix, Setanta, and a few others.  D.E. 24-1 at ¶ 17.  Most of these were signed in 2009.  *Id.*

As for the agreement between GlobeCast and Orange Business Services, Ostrow had prepared the first proposed agreement with Orange Business Services in March 2009 and thereafter made five revisions to the agreement based on discussions with representatives of Orange Business Services, as well as internal discussions with GlobeCast Sales, finance, and engineering personnel.  D.E. 24-1 at ¶ 15.  The last revision sat with Orange Business Services without comment.  *Id.*

Pertaining to the HBO contract, Justin complained that in 2009 "there had been no forward movement."  D.E. 17-2 at ¶ 12.  Justin conceded, however, that HBO was "playing hardball," and,

effectively, GlobeCast's only leverage involved walking away from the deal.  D.E. 23-5 at 35:21 - 36:10.

By November 2009, approximately four-and-one-half months after the June meeting, none of the "16.5" litigation cases had been closed.  D.E. 17-2 at ¶ 12.  Moreover, Justin felt that they "were not moving forward."  *Id.*

In addition, Justin viewed Ostrow's performance as deficient in other areas.  More specifically, Justin viewed it as the legal department's responsibility to make all contracts available for review by GlobeCast employees.  D.E. 23-5 at 50:10 - :18.  In this regard, Justin complained that Ostrow did not maintain a database for client contracts, making it difficult to obtain contracts when they were necessary.  D.E. 17-2 at ¶ 13.  GlobeCast, however, used a software program called the Contracts Management Tool ("CMT"), which was supposed to be a database of all of its contracts.  D.E. 23-5 at 49:5 - :19.  Each of the contracts should have been scanned into the CMT database.  *Id.* at 50:3 - :18.  To see that they were, Justin assigned a paralegal named Alexis "(with everyone's support) to make sure CMT [was] fully populated with signed contracts . . . ."  D.E. 17-2 at Exhibit A; D.E. 23-5 at 50:19 - 51:8.

Justin further faulted Ostrow for "consistently fail[ing] to prepare the . . . minutes" of GlobeCast Board meetings as he should have as the corporate secretary for the board of directors.  D.E. 17-2 at ¶ 13.  Ostrow, however, testified at his deposition that no board meetings occurred while Ostrow worked for GlobeCast during Justin's tenure.  D.E. 18-1 at 49:18 - 50:1.

Finally, Justin opined that "it was difficult to get clear information and quick responses from Ostrow," partially because Ostrow was located in Florida, while most of the management team was in New York.  D.E. 17-2 at ¶ 14.  In this regard, Justin stated that in September or October 2009, he asked Ostrow whether Ostrow would consider relocating to New York, but Ostrow declined.  D.E.

23-5 at 52:13 - 53:7.  Ostrow, on the other hand, denied that this or any other discussion regarding relocation ever occurred.  D.E. 18-1 at 55:11-:12; D.E. 24-1 at ¶ 19.  To the contrary, Ostrow attested that he

> had every reason to be positively disposed to [relocating to New York] as (i) [he] truly do[es] love New York, having been brought up in New Jersey within a mile of the George Washington Bridge; (ii) [his] son and his fiancé live in Manhattan; (iii) [his] daughter and her family [were] subsequently moving into the Boston area; (iv) [his] stepson and his fiancé were living in Maryland and (v) the private practice that [he] had built up before joining GlobeCast no longer existed and the viability of returning to it was slim to none.

D.E. 24-1 at ¶ 19.  And, following the end of Ostrow's 2008-2009 agreement with GlobeCast, Ostrow sought employment with employers located in South Florida, as well as outside the state of Florida.  *See* D.E. 18-1 at 79:5 - 80:12.

At the same time that Justin viewed Ostrow as being difficult to obtain clear and quick answers from, Justin felt that Carroccia had "integrated well with the sales department and had fully transitioned into his role as the lead attorney negotiating and preparing GlobeCast's commercial contracts."  D.E. 17-2 at ¶ 16.  In addition, Justin opined, Carroccia "was responsive and provided value-added solutions to [GlobeCast's] leadership, [and] he became the go-to reference for legal advice."  *Id.*

Despite Justin's allegations that Ostrow performed poorly, Cathleen Togut ("Togut"), then the Vice President, Human Resources at GlobeCast, attested that, to the best of her knowledge, Ostrow's personnel file did not contain any written warnings or reprimands, or otherwise indicate that his performance was unsatisfactory.[5]  D.E. 23-1 at ¶ 12.

---

[5]GlobeCast seeks to strike this statement of Togut's, arguing that she did not provide evidence establishing the necessary foundation, and further, that she qualified her statement with the phrase "to the best of my knowledge."  Togut, however, did attest that she served as

G.     **The Non-Renewal of Ostrow's Contract**

In late November 2009, Justin traveled to Florida, where he met with Ostrow and advised

him that GlobeCast would not be renewing Ostrow's employment agreement when the 2008-2009

agreement expired.  D.E. 17-2 at ¶ 25; D.E. 18-1 at 65:8 - :24.  At the time, Justin was 43 years old.

D.E. 17-2 at ¶ 24.  As the final decision-maker regarding the non-renewal of Ostrow's contract,

Justin advised Ostrow that the reason for the non-renewal had to do with the budget.  D.E. 18-1 at

74:12 - :16; D.E. 17-2 at ¶¶ 4, 24; D.E. 17-3 at ¶ 11; D.E. 17-5 at ¶ 14.  Ostrow had been the second-

highest paid employee of GlobeCast, and additional costs were associated with his being located in

Florida.  D.E. 17-2 at ¶ 21.  Justin believed that outside counsel could perform GlobeCast's litigation

work at a lower cost than paying Ostrow his salary to conduct the litigation work.  *Id.* at ¶ 20.

During the November 2009 conversation between Ostrow and Justin regarding the non-

renewal of Ostrow's contract, Ostrow asked Justin whether it would be acceptable to GlobeCast to

pay Ostrow's severance in 2010 so that Ostrow would not have to pay taxes on the sum until that

time.  D.E. 18-2 at 74:17 - :25.  Justin responded that he did not view Ostrow's request as

problematic.  *Id.* at 74:22 - :25.  In addition, Justin asked Ostrow whether, upon leaving GlobeCast,

Ostrow would be willing to continue working on some of GlobeCast's litigation as outside counsel.

D.E. 23-5 at 71:21 - 72:20; *see also* D.E. 18-1 at 75:20 - 76:9; *id.* at 72:21 - 73:3.

After this meeting, GlobeCast Chief Financial Officer Anne Philippe ("Philippe") contacted

_____

GlobeCast's Vice President for Human Resources and that the personnel files were located in her
office.  She further attested that she reviewed employees' contracts with them and that
coordinated the personnel actions with regard to the hiring of Carroccia.  Moreover, although
Ostrow's personnel files would appear to be within GlobeCast's control, GlobeCast submitted no
evidence even suggesting that, contrary to Togut's representation, any negative information
appeared in Ostrow's personnel file.  Under these circumstances — and particularly in light of
the requirement that the Court view the evidence in the light most favorable to the non-moving
party on summary judgment, the Court declines to strike this aspect of Togut's declaration.

Carroccia and asked Carroccia for his opinion regarding the severance payment clause in the executive-level contract like the one that Ostrow held.  D.E. 23-6 at 30:14 - 31:3; D.E. 23-1 at ¶ 7.  Philippe and Togut advised Carroccia that GlobeCast had used the form employment agreement for years.  D.E. 23-6 at 31:17 - :25.  In addition, Carroccia testified, Togut stated that the intent of the provision was that severance would be paid to an employee who was advised that his contract would not be renewed at the end of the agreement period, regardless of whether that employee was allowed to complete the term of his contractual employment.[6]  *Id.* at 35:2 - :10.  The purpose behind this provision, as Togut explained it to Carroccia, was to provide an incentive for an employee to stay for the full term of his employment, even once advised that the employment contract would not be renewed.  *Id.*

Togut attested that Sprechman had created the original provision when he served as CEO.  D.E. 23-1 at ¶ 4.  Sprechman confirmed Togut's recollection.  D.E. 23-3 at ¶ 4.  In explaining his thinking in directing that the severance provision be added, Sprechman stated that he considered the section to be "critically important to recruit and retain top executive talent."  *Id.* at ¶ 5.  Consequently, Sprechman personally told the officers with these contracts that if their contracts were not renewed, they would still receive the severance specified in the agreement.  *Id.* at ¶ 6.  Also, at

---

[6]GlobeCast seeks to strike references in the declarations of Togut, Sprechman, Frost, and Ostrow that refer to the parties' alleged intent with regard to the severance-payment provision of Ostrow's 2008-2009 agreement, arguing that parol evidence is inadmissible and irrelevant in determining, as a legal matter, the meaning of a contractual provision.  While the Court agrees that parol evidence is inadmissible and irrelevant where the contractual language at issue is not ambiguous, where contractual language is susceptible to two or more reasonable interpretations, evidence regarding the intent of the contracting parties may be both relevant and admissible.  *See Schiffman v. Schiffman*, 47 So. 3d 925, 926 (Fla. 3d DCA 2010) (quoting *Fecteau v. Se. Bank, N.A.*, 585 So. 2d 1005, 1007 (Fla. 4th DCA 1991)).  Because, as discussed *infra* at Section III.C, the Court concludes that the language of the contract is not clear and unambiguous, the testimony regarding the parties' intentions is not irrelevant and inadmissible.

Sprechman's direction, as well as later at Frost's instruction, in the course of conducting her duties as the Vice President of Human Resources for GlobeCast, Togut advised various executive-level employees that under the severance provision of the contract, GlobeCast would make severance payments in the event that they completed their contracts but their contracts were not renewed. *See* D.E. 23-1 at ¶¶ 3 - 4; D.E. 23-2 at ¶ 6. Similarly, when Frost served as CEO, she also personally told officers with these contracts that in the event that the contract was not renewed, the executive would still receive the severance specified in the agreement. D.E. 23-2 at ¶ 6. Likewise, Lisa Coelho, currently the interim CEO for GlobeCast and previously the Vice President of World TV for GlobeCast, testified at her deposition that when she first received her executive contract, Togut told Coelho that at the end of the employment term, if the contract were not renewed and Coelho's employment with GlobeCast ended, Coelho would receive a severance payment under the employment agreement. D.E. 23-4 at 5:21 - 6:5; *id.* at 9:22 - 10:5.

After reviewing the severance provision, however, Carroccia concluded that the contract did not require the payment of severance when an employee completed his contract but his contract was not renewed. *See* D.E. 17-1 at ¶ 30. On December 16, 2009, Justin met again with Ostrow to discuss the transition of Ostrow's duties to others upon Ostrow's separation from GlobeCast. D.E. 23-5 at 71: 21 - 72:20. During this meeting, Ostrow and Justin once again discussed the issue of severance pay. D.E. 18-1 at 75:4 - 75:19; D.E. 23-5 at 71:21 - 72:20. Justin advised Ostrow that GlobeCast would not be making the severance payment Ostrow had requested because GlobeCast was not required to do so. D.E. 18-1 at 75:4 - 75:19; *see also* D.E. 23-5 at 71:21 - 72:20; D.E. 17-2 at ¶ 27. Ostrow responded that he would sue GlobeCast if GlobeCast did not pay the severance to which Ostrow thought he was entitled. D.E. 23-1 at ¶¶ 5, 6; D.E. 23-5 at 71:21 - 72:20. In reply, Justin stated that he would not employ Ostrow as outside counsel if Ostrow sued the company. *Id.*

16

On December 18, 2009, GlobeCast provided Ostrow with a letter entitled, "Separation of Employment." D.E. 24-4. In this letter, GlobeCast stated, "It is with deep regret that we inform you we will be eliminating your position with [GlobeCast] effective 12/31/2009. After careful analysis of our current financial and business practices, we need to make immediate changes to decrease the organization's overall costs and remain competitive." *Id.* at 1. While employed by GlobeCast, Ostrow never complained to GlobeCast about alleged age discrimination. D.E. 18-1 at 105:3-:22.

**H.      Carroccia's Promotion and the Post-2009 Organization of GlobeCast's Legal Department**

December 31, 2009, was the last day of Ostrow's employment with GlobeCast. The next day, January 1, 2010, Carroccia was promoted to the position of Vice President, Legal & Business Affairs, and General Counsel of GlobeCast, Ostrow's former title. D.E. 17-1 at ¶ 4. In this role, Carroccia, whose present annual salary is $178,500, serves as GlobeCast's only in-house counsel. D.E. 23-6 at 43:16 - :25; 42:9 - :11; D.E. 17-1 at ¶ 23. GlobeCast, however, is looking to hire a paralegal to assist Carroccia. *Id.* at 44:2 - :11. In addition, GlobeCast has discontinued its practice under Ostrow of having its general counsel handle litigation matters. D.E. 17-1 at ¶ 21. Instead, GlobeCast hires outside counsel to perform its litigation work with oversight and approval from the general counsel. *Id.*; D.E. 17-2 at ¶ 20.

Between January 1, 2010, and June 2011, GlobeCast expended approximately $100,000 to $125,000 on outside counsel for litigation-related services of the type that Ostrow had previously provided. D.E. 23-6 at 40:13 - :24. Thus, the changes to the structure of GlobeCast's legal department resulted in a net savings to GlobeCast from January 1, 2010, through June 2011 of, at the very least, $169,250 (1½ times Ostrow's annual salary of $219,000 ($328,500), minus the total of $125,000 in outside litigation costs and 1½ times the increase in Carroccia's salary beginning

17

January 1, 2010 ($159,250), equals $169,250). This amount does not include savings associated with no longer having counsel located outside New York. Carroccia continues to prepare and negotiate commercial contracts and otherwise assist GlobeCast's business-generation efforts. D.E. 17-1 at ¶ 22. He also deals with regulatory licenses, insurance, and real estate matters. *Id.*

## I.   Bonus Payments

In addition to severance payment, Ostrow seeks bonus payments for 2008 and 2009 under his 2008-2009 contract.[7] He had received bonus payments in 2003 through 2007. *See* D.E. 17-4 at ¶ 17. In 2008 and the first half of 2009, Pinon, who was serving as the interim CEO for GlobeCast, was the final decision-maker with respect to the payment of bonuses. D.E. 17-5 at ¶ 8. In the second half of 2009, Justin made the final decision with regard to the payment of bonuses. D.E. 17-2 at ¶ 30.

Justin testified that bonus payment depended upon whether the employee had satisfied the goals and objectives for that employee's position. *See* D.E. 23-5 at 86:18 - 88:18. Employees were not told, however, that if they met these standards, they would receive bonuses. *Id.* at 88:19 - :21. In this vein, Justin considered the tasks he set forth in the e-mail following the June 16, 2009, meeting of the legal department to constitute the goals and objectives that Ostrow had to meet in order to receive a bonus in the second half of 2009. *Id.* at 88:9 - :21. Because Justin concluded that Ostrow had not fulfilled these objectives, and further, because of GlobeCast's poor financial performance, Justin stated, he decided not to make a bonus payment to Ostrow for the second half of 2009. D.E. 17-2 at ¶¶ 30 - 35.

---

[7]Ostrow implicitly concedes in his Response in Opposition to Defendant's Motion for Summary Judgment [D.E. 24] that he is not seeking bonuses for the years preceding 2008. *See* D.E. 24 at 19.

In 2009, Lisa Coehlo, Philippe, and Justin received a bonus payment.  D.E. 23-5 at 85:3 - :11.

At the time, Justin was 43 years old.  D.E. 17-2 at ¶ 24.  Mary Salih, who is over the age of 50, and

Cathleen Togut, who is currently 60 years old, however, did not receive a bonus payment.  *Id.* at

87:25 - 88:2; D.E. 23-1 at ¶¶ 1, 9; D.E. 17-2 at ¶ 33.  Carroccia, who was under the age of 40 at the

time, similarly did not receive a bonus payment in 2009.  *Id.* at ¶ 34.

### III.  ANALYSIS

**A.**     **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(C).  Not any factual dispute

will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue

of *material* fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original).  An issue is

genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee*

*Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if "it would affect the outcome of the

suit under the governing law . . . ."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

In evaluating a motion for summary judgment, the Court views the evidence, including all

reasonable inferences drawn from it, in the light most favorable to the non-moving party, and

resolves all reasonable doubts against the movant.  *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002);

*Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  Further, the Court will not

weigh conflicting evidence.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and*

*reh'g en banc denied*, 245 F. App'x 803 (11th Cir. 2007).  Thus, upon discovering a genuine dispute

regarding a material issue, the Court promptly will deny summary judgment.  *Id.*

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Instead, "[t]he non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the nonmoving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

**B.**      **Plaintiff's ADEA Claim**

Under the ADEA, an employer violates federal law by discriminating on the basis of age against an employee who is at least forty years old.  *Bradley v. Pfizer, Inc.*, 2011 WL 3962824, *2 (11th Cir. Sept. 9, 2011) (citing 29 U.S.C. §§ 623(a), 631(1)).  Here, where no direct evidence[8] of

---

[8]Direct evidence of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Kilpatrick v. Tyson Foods, Inc.*, 268 F. App'x 860, 861-62 (11th Cir. 2008). Such direct evidence reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee," and must indicate that the adverse employment decision was motivated by the decision-maker's intent to discriminate. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)). As a result, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence." *Kilpatrick*, 268 F. App'x at 862.  In the pending case, the parties do not suggest, and the record does not show, that direct evidence of age discrimination exists.

discrimination exists, Plaintiff may establish his *prima facie* claims of age discrimination through circumstantial evidence. *See id.*

In evaluating whether a plaintiff has set forth a *prima facie* case of discrimination through the use of circumstantial evidence, the Eleventh Circuit has applied the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11ᵗʰ Cir. 1995) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11ᵗʰ Cir. 1989)). Under the *McDonnell Douglas* framework, a plaintiff must first demonstrate a *prima facie* case of discrimination, which creates a presumption that the employer discriminated against him. *Curtis v. Broward County*, 292 F. App'x 882, 883 (11th Cir. 2008)[9] (citing *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006)); *Holifield v. Reno*, 115 F.3d 1555 (11ᵗʰ Cir. 1997).

Where the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to come forward with evidence of a legitimate, non-discriminatory reason for the challenged adverse employment action, which rebuts the presumption of discrimination. *Id.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citing *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)); *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1378 (S.D. Ga. 2008). If the defendant meets this burden of production, the burden then shifts back to the plaintiff to establish that the defendant's proffered reasons are merely pretext for the employer's discriminatory actions. *Id.* In other words, a plaintiff must come forward with evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real

---

[9]The Eleventh Circuit has applied the order and allocation of proof in cases arising under Title VII to those of age discrimination. *Walker*, 53 F.3d at 1555. Consequently, this Court cites opinions involving Title VII cases to the same extent as those regarding ADEA cases.

reasons" for the employment action. *Perrero v. Spectacor Mgmt. Group*, 308 F. App'x 327, 329 (11th Cir. 2009) (quoting *Chapman v. A.I. Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)).

### *1. Prima Facie* Case

In order to establish a *prima facie* case of disparate treatment under the ADEA, a plaintiff must show that (1) he was a member of the protected group of persons between the ages of forty and seventy; (2) he was subject to adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job for which he suffered the adverse employment action. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1431 (11th Cir. 1998). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Nevertheless, in the face of a defendant's motion for summary judgment, failure to satisfy any one of the elements of the *prima facie* case requires the entry of summary judgment against a plaintiff. *Turlington*, 135 F.3d at 1432-33. Here, for purposes of its Motion for Summary Judgment only, GlobeCast concedes that Ostrow has established a *prima facie* case under the ADEA. *See* D.E. 15 at 5.

### *2. Legitimate, Non-discriminatory Reason for Adverse Action*

As a result, the burden shifts to GlobeCast to come forward with evidence of a legitimate, non-discriminatory reason for its decision not to renew Ostrow's employment agreement. GlobeCast offers three reasons for not renewing Ostrow's agreement: (1) Ostrow's allegedly unsatisfactory performance; (2) financial considerations and restructuring of the legal department;[10] and (3) the

---

[10]GlobeCast breaks out restructuring of the legal department and financial considerations into two reasons. *See* D.E. 15 at 6; D.E. 28 at 3. The Court views these reasons as part and parcel of each other, as GlobeCast itself describes the basis for and goal of the restructuring as

natural expiration of Ostrow's 2008-2009 contract.

The Court finds that two of GlobeCast's reasons are adequate to satisfy the employer's burden of production. *See Vessels v. Atlanta Independent School System*, 408, F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions). Financial considerations, along with a restructuring to accomplish cost savings, can be a legitimate reason for not renewing a contract when these reasons are not used as a proxy for age. *See Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 117 (2d Cir. 1991); *Thomure v. Phillips Furniture Co.*, 30 F.3d 1020, 1024 (8th Cir. 1994); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125-26 (7th Cir. 1994). Similarly, an employee's good-faith belief that an employee had a sub-par work performance can serve as a legitimate business reason for adverse employment action. *See, e.g., Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 873 (11th Cir. 2011); *Aldabblan v. Festive Pizza, Ltd.*, 380 F. Supp. 2d 1345, 1352-53 (S.D. Fla. 2005). The employer's burden to set forth a legitimate business reason "is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons.'" *Chapman*, 229 F.3d at 1024 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).

As for the natural end of the contractual period, under certain circumstances, such as where an employer hires a number of employees for a one-time, particular job (like, for instance, a construction project), the natural termination of a contract may constitute a legitimate business reason for letting an employee go. That, however, is not the case here. In this case, Ostrow had worked for GlobeCast without a contract and subsequently under three consecutive contracts

---

saving money. *See* D.E. 15 at 6.

23

(including a three-month at-will period between the 2004-2005 and 2006-2007 agreements) over the span of approximately six years.  Under these circumstances, the non-renewal of Ostrow's contract, standing in and of itself, cannot serve as a legitimate business reason for GlobeCast's actions because it does not effectively provide a non-discriminatory reason for GlobeCast's decision not to renew Ostrow's employment.

Nor do the cases upon which GlobeCast relies suggest otherwise.  In *Tori v. Marist College*, 344 F. App'x 697, 701-02 (2d Cir. 2009), the plaintiff was denied an opportunity to teach a five-week class.  In explaining its decision, the defendant cited its practice of not rehiring former faculty members who, like the plaintiff, had been through the formal tenure review process, had been denied, and had had their contracts allowed to expire.  *See Tori*, 344 F. App'x at 701-02.  Although the court concluded that the defendant's stated reason qualified as a legitimate, non-discriminatory reason for its adverse employment action against the plaintiff, the defendant did not suggest — and the court did not conclude — that the defendant was relying entirely for its legitimate business reason on the natural end of the plaintiff's contract.

And in *Garrett v. Judson Independent School District*, 299 F. App'x 337, 345-346 (5th Cir. 2008), the defendant proffered that the plaintiff's teaching contract was not renewed based solely on her inadequate performance, not because the contract had reached its "natural end."  *See Garrett*, 299 F. App'x at 345-46.  Thus, the *Garrett* Court did not even consider the fact that the plaintiff had a term contract that expired as a factor in determining whether the defendant had come forth with a legitimate, non-discriminatory business reason for its action.  The Court has likewise been unable to locate any other cases that accept as a legitimate reason for adverse employment action solely that an employment contract came to a natural end.  That is not to say, however, that the termination of

the contract by its own terms, in conjunction with another reason such as one of the two others that GlobeCast offers, is irrelevant.  Rather, purely in and of itself, it cannot serve as a legitimate business reason for not renewing an employee's contract.  Nevertheless, because GlobeCast's first two reasons for not renewing Ostrow's contract satisfy its burden under the *McDonnell Douglas* framework, the burden shifts back to Ostrow to show that GlobeCast's reasons are merely pretext and the real reason for its decision not to renew Ostrow's contract was age discrimination.

### *3.  Pretext*

In order to create a genuine issue of material fact on the question of pretext, Ostrow must demonstrate that GlobeCast's proffered legitimate business reason was not the real reason for the employment decision.  *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).  In other words, a plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations omitted).  A plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*  In the latter approach, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds*.

### *a.  Sub-par Performance*

Ostrow challenges GlobeCast's characterization of Ostrow's performance as sub-par and

asserts that this reason set forth by GlobeCast is merely pretextual.  In support of his contention, Ostrow notes that he was never disciplined during his time at GlobeCast, and GlobeCast asked Ostrow to continue working for GlobeCast as outside counsel following the expiration of Ostrow's contract.

For its part, GlobeCast responds that as a vice president and general counsel, Ostrow did not hold a position where he would be disciplined for performance issues.  Moreover, GlobeCast asserts in response to the fact that it offered to allow Ostrow to continue working for GlobeCast as outside counsel on litigation matters that "[t]he role of General Counsel at GlobeCast involved more than litigating cases.  Plaintiff did not close litigation cases fast enough, and his performance was deficient in other areas of his responsibility as well."  D.E. 28 at 4.

The Court concludes that Ostrow has established a material issue of fact with respect to whether performance issues really motivated GlobeCast's decision not to renew Ostrow's contract. Offering to pay Ostrow as outside counsel to handle precisely the same litigation that he conducted while a GlobeCast employee is entirely inconsistent with GlobeCast's professed concerns about Ostrow's litigation performance, whether it related to the speed with which Ostrow closed cases or any other aspect of Ostrow's litigation efforts at GlobeCast.

As for alleged deficiencies in other areas of responsibility, Justin points to Ostrow's failure to prepare minutes of meetings of GlobeCast's board.  But Ostrow testified unrebutted that during Justin's tenure, no such meetings occurred.  With respect to the maintenance of a contract database, Justin agreed that a paralegal named Alexis was assigned to conduct that task and that Ostrow was deficient to the extent that, as general counsel, he was responsible for what occurred in the legal department.  In short, the evidence of record contains sufficient inconsistencies to cast doubt on

26

GlobeCast's statement that it did not renew Ostrow's contract because of Ostrow's deficient performance.  The fact a material issue of fact exists with regard to whether GlobeCast's performance reason was pretextual, however, does not end the summary judgment inquiry.  Instead, the Court must consider whether Ostrow has presented sufficient evidence to call into question GlobeCast's alternative reason for not renewing Ostrow's contract: financial considerations and the restructuring of the legal department.

### b.  Financial Considerations and Restructuring of the Legal Department

In response to GlobeCast's asserted reason that it did not renew Ostrow's contract because it restructured its legal department in an effort to save money, Ostrow retorts that, contrary to GlobeCast's contention, Ostrow's position was not eliminated, as Carroccia was placed in the position the very next day after Ostrow's contract terminated, and GlobeCast's actions resulted in GlobeCast's spending "substantially more money for less services."  D.E. 24 at 8.  The Court does not agree.

Although Ostrow correctly notes that Carroccia effectively replaced Ostrow, that does not change the fact that Ostrow failed to point to any evidence suggesting that GlobeCast's legal department was not restructured.  Following the end of Ostrow's employment, the legal department employed only one attorney (Carroccia) instead of the two who were there during most of Ostrow's tenure.  In addition, whereas under Ostrow's service as the general counsel, the legal department handled much of GlobeCast's litigation in-house, following Ostrow's separation from GlobeCast, GlobeCast contracted all of its litigation to outside counsel, focusing in-house on contracts instead. The net result of these changes, contrary to Ostrow's argument, resulted in a savings to GlobeCast of at least $169,250 during the year and one-half following the end of Ostrow's employment with

GlobeCast.

Ostrow similarly has not shown any evidence suggesting that GlobeCast's stated financial concerns were pretextual. To the contrary, the significant evidence of GlobeCast's negative financial position stands unrebutted on the record. While Ostrow worked for GlobeCast, it never turned a profit, it reduced its workforce by at least half, and it consolidated its offices all to reduce costs. Moreover, the expiration of Ostrow's contractual term of employment provided a natural time for GlobeCast to continue its restructuring and attempt to save money. Finally, GlobeCast has consistently represented its financial problems as the reason for not renewing Ostrow's contract: Justin advised Ostrow of this reason at the time that Justin informed Ostrow that GlobeCast would not be renewing Ostrow's contract, GlobeCast's formal letter to Ostrow stating that his contract would not be renewed similarly invoked GlobeCast's financial considerations, and, as noted above, the evidence GlobeCast has submitted in this case is all very consistent with the notion that GlobeCast did not renew Ostrow's contract for financial reasons. Under these circumstances, the Court finds that Ostrow has not cast sufficient doubt on GlobeCast's proffered reasons of financial considerations and the restructuring of the legal department to allow a reasonable jury to conclude that GlobeCast's concerns as stated were not actually what motivated its decision not to renew Ostrow's contract. As a result, summary judgment for GlobeCast on Count I (the ADEA claim) is appropriate.

**C.      Ostrow's Breach-of-Contract Claims**

The Court analyzes Ostrow's breach-of-contract claims under Florida law. In consulting Florida law, the Court first considers rulings of Florida's Supreme Court. *See Bailey v. S. Pac. Transp. Co.*, 613 F.2d 1385, 1388 (5th Cir.), *cert. denied*, 449 U.S. 836 (1980). Where the highest

court in the state has rendered no decisions on point, however, this Court must follow the opinions of Florida's intermediate courts, unless it is "convinced that the highest court would decide otherwise." *Id.* (citing *Comm'r v. Bosch*, 387 U.S. 456, 465 (1967)).[11]

To state a claim for breach of contract under Florida law, a plaintiff must establish each of the following elements: (1) a valid contract; (2) a material breach; and (3) damages. *See Schiffman v. Schiffman*, 47 So. 3d 925, 926 (Fla. 3d DCA 2010) (citing *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000)). In evaluating these elements, Florida courts have explained that where a contract's terms are "clear and unambiguous, the 'language itself is the best evidence of the parties' intent and its plain meaning controls . . . .'" *Pearson v. Caterpillar Fin. Servs. Corp.*, 60 So. 3d 1168, 1171 (Fla. 4th DCA 2011) (quoting *Fecteau v. Se. Bank, N.A.*, 585 So. 2d 1005, 1007 (Fla. 4th DCA 1991)). On the other hand, where "'two reasonable interpretations' of a contract [exist], 'summary judgment is inappropriate because there is a genuine issue of material fact.'" *Id.* (quoting *Fecteau*, 585 So. 2d at 1007). Under those circumstances, "'the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties.'" *Id.* (quoting *Fecteau*, 585 So. 2d at 1007 (quoting *Bacardi v. Bacardi*, 386 So. 2d 1201, 1203 (Fla. 3d DCA 1980))).

Here, Ostrow alleges two breaches of his 2008-2009 contract with GlobeCast (1) failure to pay severance; and (2) failure to pay bonuses. The Court considers each contention below.

### 1. Failure to Pay Severance

Ostrow contends that his 2008-2009 agreement with GlobeCast bound GlobeCast to pay him

---

[11]Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

severance, regardless of whether GlobeCast allowed Ostrow to finish the term of his contract or not. GlobeCast, on the other hand, argues that the 2008-2009 employment agreement provided for severance payments only in the event that GlobeCast ended an employee's employment prior to the contractual term of employment.

       To resolve this dispute, the Court considers the operative provisions of Ostrow's 2008-2009 agreement, beginning with Section 2.  Section 2 states,

> The Employee's employment by [GlobeCast] under this Agreement shall commence on January 1, 2008, and shall terminate on December 31, 2009.

> Notwithstanding the aforementioned, [GlobeCast] may terminate this Agreement at any time in its sole discretion with thirty (30) days written notice to Employee.  In the event that [GlobeCast] so elects to terminate this Agreement for any reason except for cause (as defined herein), [GlobeCast] shall pay Employee the remaining balance due under this Agreement, ***as well as payments due in accordance with the involuntary termination provisions stipulated in paragraph 8 of this Agreement***.

D.E. 24-5 at § 2 (emphasis added).  Section 8 of the contract, as relevant here, further provides,

> In the event of an involuntary termination of the Employee, the Company shall pay the Employee (subject to normal withholdings): a) the remaining balance due under this Agreement, plus b) a one-time payment equivalent to six (6) months['] base salary at his/her current rate.   In addition, the Company shall pay the COBRA premiums for medical insurance for employee and dependent coverage the first three months following termination of employment. ***The provisions of this paragraph shall remain in effect as long as Employee's employment with the Company is continuous without a break in service and shall survive the termination of this Agreement.***  Payment shall be made no later than thirty (30) calendar days from the date of termination.

> Involuntary termination is defined as the termination of the Employee by the Company without Cause . . . .

*Id.* at § 8 (emphasis added).

GlobeCast reasons that Section 2 "contemplates two scenarios under which Plaintiff's employment may be terminated: (1) the natural expiration of the term as defined by the express terms of the Employment Agreement; or, (2) termination of the Employment Agreement by the Company prior to the expiration of the term, at the Company's sole discretion, and with written notice to Plaintiff." D.E. 15 at 15. Only under the second manner of termination — early termination, GlobeCast urges, is severance payable. D.E. 15 at 15.

In further support of this theory, GlobeCast points to the sentence within Section 8 that states, "involuntary termination is defined as the termination of the Employee by the Company without cause . . . ," D.E. 15 at 16, and reasons that an "'involuntary' termination as described in Section 8 clearly refers only to a situation where the Company has decided to terminate Plaintiff prior to the natural expiration of the term of employment." *Id.* at 16. GlobeCast continues, noting that Section 8 provides for, among other compensation, "the remaining balance due under this Agreement." *Id.* Because an employee whose natural term of employment has ended would not have a remaining balance due under the contract, GlobeCast argues, Section 8 cannot apply to such an employee or else the Court would have to ignore this provision in violation of the contractual canon that courts give effect to every term of a contract where possible. *Id.*

The problem with GlobeCast's argument stems from the fact that the construction GlobeCast urges would require the Court to do exactly what GlobeCast warns against: ignore provisions within the contract. GlobeCast does not address the meaning of the italicized sentence in Section 8: "The provisions of this paragraph shall remain in effect as long as Employee's employment with the Company is continuous without a break in service and shall survive the termination of this

31

Agreement." If, as GlobeCast suggests Section 2 of the contract requires, Section 8's severance provisions applied only if GlobeCast terminates the employment agreement early, the Court can discern no reason for the inclusion in Section 8 of the language that "[t]he provisions of [Section 8] . . . shall survive the termination of this Agreement." *Id.* at § 8. The italicized portion of Section 8 would be entirely unnecessary and redundant because under GlobeCast's construction, the second paragraph of Section 2 contemplates that Section 8's severance provisions apply only if GlobeCast terminates the employment agreement early.

Thus, the Court must consider whether any other reasonable interpretation of the 2008-2009 agreement would remedy this surplusage problem, as "no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it[.]" *Roberts v. Sarros*, 920 So. 2d 193, 196 (Fla. 2d DCA 2006) (quoting *Singer v. Singer*, 706 So. 2d 914, 915 (Fla. 4th DCA 1998) (citations omitted)) (quotation marks omitted). In engaging in this review, the Court notes that the 2008-2009 agreement appears to distinguish between employment by GlobeCast under the agreement and employment by GlobeCast irrespective of any agreement (at-will employment). For example, Section 7 states, in relevant part, "[GlobeCast] shall have the right to terminate this Agreement ***and*** the Employee's employment with the Company for cause. . . ." D.E. 24-5 at § 7 (emphasis added). In other words, employment under the contract and employment without respect to the contract may be two different things; GlobeCast could terminate the agreement or allow it to expire without renewing it, yet still employ the employee without a contract. Indeed, in 2006, that is exactly what GlobeCast did in Ostrow's case for the period from January 1 through March 31. Construing the contract to distinguish between employment under the agreement and employment without regard to a contract would render

32

meaningful the otherwise-problematic provision of Section 8 stating that the severance provisions shall survive the termination of the employment agreement.

Moreover, the second paragraph of Section 8 notes that the term "involuntary termination," as used in the first paragraph of Section 8, "is defined as the termination of the Employee by [GlobeCast] without Cause (as defined in paragraph 7 of this Agreement)." *Id.* at § 8. It is significant that this sentence refers to the "termination of the Employee," meaning, as this Court understands it, the termination of the employee's employment with GlobeCast, whether under an employment agreement or at will, as opposed to referring simply to the termination of the employment agreement.

Nor does Section 8's provision that an employee who experiences an involuntary termination receive, among other things, "the remaining balance due under this Agreement" necessarily affect the analysis. Section 8's severance benefits are multiple and apply in the case of an employment termination both before or after the expiration of the contract period. The fact that an employee might be terminated after or with the expiration of the contract period does not thereby render surplusage the contingency requiring payment of any remaining balance under the contract any more than the portions of the agreement setting forth the definition of "cause" under the provision entitled "Termination for Cause" (Section 7) constitute surplusage where an employee is not terminated for cause. In short, in order to give effect to the contract as a whole, *see Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004), the Court cannot find that, as a matter of law, the 2008-2009 employment agreement does not require a severance payment under Section 8. Instead, the Court concludes that the construction requiring payment of severance after separation following the completion of a contractual term of employment is also a reasonable

33

interpretation of the contract.  Consequently, the severance-payment issue is not appropriate for summary judgment.

Finally, the Court is not persuaded to the contrary by *Paladyne Corp. v. Weindruch*, 867 So. 2d 630 (Fla. 5th DCA 2004).  GlobeCast contends that the *Paladyne* Court considered an analogous contractual provision and concluded that the construction urged by GlobeCast in this case applied there.  The problem with GlobeCast's position arises from the fact that the contract at issue in *Paladyne* was materially distinguishable from the employment agreement at issue here.  In *Paladyne*, the agreement contained a self-renewing provision and specified the consequences of termination "without cause," "with cause," and "by [e]mployee."  *Id.* at 632.  For a termination without cause, an employee was entitled to severance pay.  In *Paladyne*, the plaintiff's contract was not renewed, and he contended that he was terminated without cause and therefore entitled to receive severance pay.  *Id.* at 633.

The *Paladyne* Court rejected the plaintiff's position, reasoning that "[t]here would be no point in having a non-renewal provision if the effect of not renewing the contract is identical to the effect of terminating the contract . . . ."  *Id.*  As noted above, in *Paladyne*, the contract included a self-renewing provision, thus effectively and implicitly setting forth a fourth category of termination. Here, however, no renewal provision exists in Ostrow's employment agreement, and, as discussed previously, the history between Ostrow and GlobeCast reveals that GlobeCast allowed Ostrow to continue working at GlobeCast at will and without a renewed employment agreement for three months after his 2004-2005 employment agreement expired.  Therefore, the lack of a renewal provision in Ostrow's employment agreement results in the absence of the fourth category of termination that existed in *Paladyne* and that drove the Court's logic in *Paladyne*.  Moreover, in the

instant matter, other provisions in Ostrow's employment agreement exist that did not in *Paladyne*, and, for the reasons previously discussed, adopting GlobeCast's proposed construction would require the Court to ignore them.  Thus, *Paladyne* is not instructive in this case, and summary judgment must be denied.

### 2.  Failure to Pay 2008 and 2009 Bonuses

Ostrow also claims that GlobeCast breached Ostrow's 2008-2009 contract by failing to award Ostrow bonuses in 2008 and 2009.  The relevant language of the employment agreement appears in Section 3 of the contract and states,

> Employee shall be entitled to receive a semi-annual bonus of up to 15% of his/her annual base salary if Employee meets certain established objectives set forth at the beginning of each period.  The objectives that are established are to be determined by the Company, at its sole discretion, and shall be final and binding. . . .

D.E. 24-5 at §3.B.  Beginning once again with the contractual language, the Court notes that while the provision makes clear that the objectives that an employee must meet shall be established under the sole and unreviewable discretion of GlobeCast, the contract nonetheless "entitles" the employee to receive such semi-annual bonuses if the employee "meets [these] certain established objectives set forth at the beginning of each period."  Here, GlobeCast has submitted no evidence showing that it established any objectives at the beginning of both six-month periods in 2008 and the first six-month period in 2009.  As a result, it has not carried its burden on summary judgment, and summary judgment must be denied with respect to this period.

With regard to the second half of 2009, GlobeCast points to the tasks set forth by Justin's June 16, 2009, memorandum and states that this document identified the established objectives for Ostrow to meet.  As the objectives that are to be established under the contract fall within

GlobeCast's sole discretion, it was within GlobeCast's prerogative to establish these tasks as the objectives governing the appropriateness of awarding a bonus in the second half of 2009, regardless of whether Ostrow might have thought the objectives to be unreasonable.

GlobeCast has submitted evidence that Ostrow did not accomplish at least some of the tasks set forth in the June 16, 2009, e-mail from Justin.  For example, contrary to the direction that Ostrow "continue handling [the litigation] cases with the objective of finishing a maximum of them by year's end," *see* D.E. 17-2 at 9, Ostrow did not complete a single such case by the expiration of his contract on December 31, 2009.  Nor, as Ostrow suggests, does Ostrow's successors' failure to complete the specified litigation subsequently render the objective void.  As noted above, under the unambiguous language of the employment agreement, the bonus objectives fall within the sole discretion of GlobeCast.  Because Ostrow has submitted no evidence to controvert GlobeCast's position that Ostrow did not complete the objectives set forth in the June 16, 2009, e-mail, GlobeCast is entitled to summary judgment with respect to Ostrow's claim for a bonus during the second half of 2009.

### ***CONCLUSION***

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.  The Court **GRANTS** Defendant's Motion for Summary Judgment with regard to Count I of the Complaint and with regard to the second 2009 bonus claim under Count II of the Complaint.  The Court **DENIES** Defendant's Motion for Summary Judgment as it pertains to the severance payment claim and the claims for bonuses in 2008 and the first half of 2009 under

Count II of the Complaint.

**DONE** and **ORDERED** at Fort Lauderdale, Florida this 13th day of October 2011.

ROBIN S. ROSENBAUM

United States Magistrate Judge

cc:     Counsel of Record